**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 16 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellant,

v.

JASON MALTINO DAVIS,

      Defendant - Appellee.

No. 01-3291

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 01-CR-40036-RDR)**

---

Richard A. Friedman, Attorney, Appellate Section, Criminal Division, United States Department of Justice (James E. Flory, United States Attorney, Nancy Landis Caplinger and Gregory G. Hough, Assistant United States Attorneys, Topeka, Kansas, with him on the briefs), Washington, D.C., for Plaintiff - Appellant.

Ronald E. Wurtz, Assistant Federal Public Defender (David J. Phillips, Federal Public Defender, with him on the brief), Topeka, Kansas, for Defendant - Appellee.

---

Before **HENRY**, **PORFILIO** and **ANDERSON**, Circuit Judges.

---

**PORFILIO**, Circuit Judge.

---

The government appeals the district court's grant of Jason Maltino Davis' motion to suppress 58 grams of crack cocaine and three firearms seized from his home. The sole issue for our consideration is whether the district court properly granted Mr. Davis' motion after finding *no* exigent circumstances to justify the officers' warrantless search of Mr. Davis' home. Finding no error, we affirm.

Shortly before 5:30 A.M. on October 13, 2000, Grandview Plaza, Kansas Police Officer, Richard Parsons, and Geary County Deputy Sheriff, James Fletcher, responded to a dispatcher's report of a possible domestic disturbance at a Grandview Plaza home. The address was known to Officer Parsons as the residence of Jason Davis and Desiree Coleman. The officer had prior contact with Mr. Davis over minor, non-violent circumstances, and Mr. Davis was not wanted for any criminal offense.

Arriving first, Officer Parsons heard no noise and saw no evidence of a disturbance. The front door of the house opened. Mr. Davis appeared, clad only in a pair of boxer shorts; he had alcohol on his breath and bloodshot eyes. Standing in the doorway, Mr. Davis told the officer he had been disciplining his child and that was the reason for the noise. Officer Parsons asked for the whereabouts of Ms. Coleman and Mr. Davis replied she was in Topeka. That response notwithstanding, Ms. Coleman chose this point to appear. She wrapped her arms about Mr. Davis' waist and stated the couple had been arguing. Officer Parsons' attempt to talk to the scantily clad Ms. Coleman was impeded by Mr. Davis who tried to shield her from the officer.

- 2 -

At this point, Deputy Fletcher arrived. Officer Parsons then told Mr. Davis to step aside and stop blocking his view of Ms. Coleman who was resisting her husband's efforts to close the door. Mr. Davis refused the officers' request to enter the home, but Deputy Fletcher told him they were coming in anyway to check on Ms. Coleman. Mr. Davis responded by opening the door and ordering Ms. Coleman to go outside while he retreated into the house.

According to the findings of the district court, both officers then entered and told Mr. Davis to stop his retreat. Officer Parsons testified Ms. Coleman tried to block him with her arm, but he pushed her away and entered. He testified he did so because of "officer's safety [sic] and concern for Deputy Fletcher's welfare." He also stated he was concerned "when Mr. Davis was going toward the back room, that he was either going for a weapon or that he was trying to evade [sic] the officers in the investigation." Mr. Davis, meanwhile quickly continued to the back of the house and returned with a child in his arms.[1] Putting the child down, he turned to go once again to the rear of the house, prompting Deputy Fletcher to put his hand on his gun and to order Mr. Davis to stop.

Obeying that order, Mr. Davis went outside with Deputy Fletcher and stated he wanted both officers to leave his home. Officer Parsons, however, remained inside with Ms. Coleman who began expressing her dissatisfaction with the officers and their presence. Indeed, she refused to consent to a search of the house and told Officer Parsons

---

[1] Officer Parsons stated: Mr. Davis "suddenly jolt[ed] into the house and head[ed] back towards the back bedroom. He wasn't running but, in my opinion, he was moving in a quick pace."

he would have to obtain a warrant to do so. At this point, Officer Parsons noted an ashtray containing evidence of marijuana use.

The officers then placed both occupants in custody and told them to make arrangements for someone to watch their children. While the children's clothes were being gathered, Officer Parsons observed a "marijuana blunt" and three weapons.[2]

Later the same day, Officer Parsons applied for and obtained a warrant to search the house for marijuana. During that search, the evidence leading to the indictment of Mr. Davis was discovered. Mr. Davis moved to suppress that evidence; the motion was granted, and the government has appealed, contending the officers' actions were justified on the ground of exigent circumstances.

"The existence of exigent circumstances is a mixed question of law and fact." *United States v. Anderson*, 154 F.3d 1225, 1233 (10th Cir. 1998) (*quoting United States v. Anderson*, 981 F.2d 1560, 1567 (10th Cir. 1992)). "Although we accept underlying fact findings unless they are clearly erroneous, 'the determination of whether those facts satisfy the legal test of exigency is subject to de novo review.'" *Anderson*, 154 F.3d at 1233 (*citing Anderson*, 981 F.2d at 1567) (*quoting United States v. Stewart*, 867 F.2d 581, 584 (10th Cir. 1989)). With these concepts in mind, we turn to the merits of the appeal.

The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980) (citation

---

[2]Upon a subsequent check, the guns were revealed to have been stolen.

omitted). "[A] principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment on agents of the government who seek to enter the home for purposes of search or arrest." *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (citation omitted). "With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (citations omitted).[3]

"Probable cause accompanied by exigent circumstances will excuse the absence of a warrant." *Howard v. Dickerson*, 34 F.3d 978, 982 (10th Cir. 1994) (citations omitted).

> The basic aspects of the "exigent circumstances" exception are that (1) the law enforcement officers must have reasonable grounds to believe that there is immediate need to protect their lives or others or their property or that of others, (2) the search must not be motivated by an intent to arrest and seize evidence, and (3) there must be some reasonable basis, approaching probable cause, to associate an emergency with the area or place to be searched.

*United States v. Smith*, 797 F.2d 836, 840 (10th Cir. 1986). Exceptions to the warrant requirement "have been jealously and carefully drawn." *Jones v. United States*, 357 U.S. 493, 499 (1958) (citation omitted); *Welsh*, 466 U.S. at 749 (exceptions are "few in number and carefully delineated.") (citation omitted). When a government agent enters a

---

[3]*See also* **Welsh v. Wisconsin**, 466 U.S. 740, 749 (1984) (It is "a basic principle of Fourth Amendment law[,] that searches and seizures inside a home without a warrant are presumptively unreasonable.") (internal quotations and citations omitted). The Fourth Amendment, of course, is applicable to the states via the Fourteenth Amendment. **Minnesota v. Dickerson**, 508 U.S. 366, 372 (1993) (*citing* **Mapp v. Ohio**, 367 U.S. 643 (1961)).

home without a warrant, "the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." *Welsh*, 466 U.S. at 750 (*citing* *Payton*, 445 U.S. at 586). Our determination whether exigent circumstances exist "ultimately depends on the unique facts of [the] controversy." *United States v. Wicks*, 995 F.2d 964, 970 (10th Cir. 1993) (internal quotations and citations omitted).

In this case, the government claims Officer Parsons and Deputy Fletcher's warrantless entry was justified by the officers' reasonable concern Mr. Davis' rapid retreat posed a significant and immediate risk to the officers' safety. *Compare Warden v. Hayden*, 387 U.S. 294, 298-99 (1967) (exigent circumstances justified warrantless entry of house to search for armed robbery suspect and weapons because a delay would endanger lives of officers and citizens). The government further contends the officers "entered for the limited purpose of protecting officer safety by gaining control of Mr. Davis, not for the purpose of conducting any search of the residence."[4]

---

[4]The government argues Mr. Davis' re-entry into his home, with the stated intention of getting his child, gave the officers the right to conduct a protective sweep of Mr. Davis' residence, in accord with *Maryland v. Buie*, 494 U.S. 325 (1990). As Mr. Davis points out, the government's argument may be briskly disposed with the definition of "protective sweep." As it appears in the first sentence of *Buie*, "[a] 'protective sweep' is a quick and limited search of premises, *incident to an arrest* and conducted to protect the safety of police officers or others." *Id.* at 327 (emphasis added). When the police in this case entered Mr. Davis' home no one was under arrest, and at that time, there was no probable cause to arrest anyone. Even if a "protective sweep" were permissible, argues Mr. Davis, the government's sweep exceeded the scope prescribed in *Buie*. *Id.* (A protective sweep "is narrowly confined to a cursory visual inspection of those places in which a *person* might be hiding.") (emphasis added).

Relying on ***Terry v. Ohio***, 392 U.S. 1 (1968), the government suggests "due weight must be given . . . to the specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience." ***Id.*** at 27. The government argues Mr. Davis' behavior and obvious untruthfulness, coupled with the training and experience of the officers, justified a belief Mr. Davis' movement to the rear of the house created a risk to their safety. Yet, the facts suggest such a belief is, at best, equivocally grounded.

There was no evidence introduced that indicated the officers believed Mr. Davis had a reputation for violence. Nor had he displayed a threatening or aggressive manner when he initially contacted the officers. It is true he lied about Ms. Coleman's whereabouts, but any concern that lie might have effected was allayed when she appeared without any signs of harm. Moreover, the only manifestation of resistance displayed by Mr. Davis was his insistence upon keeping the officers outside. As the district court noted, even Ms. Coleman, "the suspected victim[,] was trying to prevent" the officers from entering Mr. Davis' residence. ***United States v. Davis***, No. 01-40036-01-RDR, 2001 WL 1013313, at *4 (D. Kan. Aug. 7, 2001). The court therefore logically concluded the officers "[o]bviously . . . could [have] check[ed] her condition without entering the home." ***Id.*** Moreover, as stated in Mr. Davis' brief, "Parsons knew Davis had children, so his withdrawal from police presence should have been wholly unthreatening."

Nevertheless, the government insists the district court erred by giving substantial weight to Officer Parsons' knowledge of Mr. Davis' historically peaceable manner and other facts, like Parsons' knowledge Mr. Davis is a father. The government contends Mr. Davis' prior behavior occurred under "normal circumstances," which the pre-dawn circumstances of the domestic call in this case, were anything but. The government points to the early hour, the alcohol on Mr. Davis' breath, and his bloodshot eyes. Mr. Davis persuasively counters, however, this court gives substantial weight to police knowledge, or lack thereof, of a defendant's history prior to the incident under inquiry. *See* **United States v. Tisdale**, 921 F.2d 1095, 1097 (10th Cir. 1990) ("Given defendant's actions and background it was not unreasonable for [the officer] to believe that other dangerous people might be present or that the defendant would return."); **United States v. Stewart**, 867 F.2d 581, 584 (10th Cir. 1989) (citation omitted) ("The reasonableness of the officers' conduct hinges on the facts within their knowledge indicating exigency.").

"The government bears the burden of proving exigency. . . . In assessing whether the burden was met we are guided by the realities of the situation presented by the record. We should evaluate the circumstances as they would have appeared to prudent, cautious, and trained officers." **Anderson**, 154 F.3d at 1233 (citation omitted). We believe, because of the facts of this case, the district court correctly concluded the government failed to meet its burden.

While danger was not readily apparent when Officer Parsons arrived, the government also argues, "Parsons was properly alert that it might evolve in that

direction." The government cites *Fletcher v. Town of Clinton* for its statement, "[o]n the spot reasonable judgments by officers about risks and dangers are protected. Deference to those judgments may be particularly warranted in domestic disputes. In those disputes, violence may be lurking and explode with little warning." 196 F.3d 41, 50 (1st Cir. 1999). Essentially, the government asks for a special rule for domestic calls because they are inherently violent, and the police, responding to theses calls, are automatically at greater risk. We do not believe this case justifies a venture into that new territory.

As contended by Mr. Davis, granting unfettered permission to officers to enter homes, based only upon a general assumption domestic calls are *always* dangerous, would violate the Fourth Amendment. *See Stewart*, 867 F.2d at 584-85 (observing facts *particular* to the specific case bear on the validity of the exigency). Keeping in mind a warrantless search is more intrusive than the failure of police to comply with the knock-and-announce rule, as an analogy, the Supreme Court has already rejected categoric exclusion of drug cases from knock-and-announce compliance. *Richards v. Wisconsin*, 520 U.S. 385, 396 (1997) ("[W]e reject the blanket exception to the knock-and-announce requirement for felony drug investigations."). Similarly, we hold an officer's warrantless entry of a residence during a domestic call is not exempt from the requirement of demonstrating exigent circumstances.

A warrantless intrusion into a home may be justified by probable cause for a search when the safety of law enforcement officers is threatened. *Hayden*, 387 U.S. at 298-99. Here, however, the government failed to demonstrate the district court's

underlying factual findings were clearly erroneous.  ***Anderson***, 154 F.3d at 1233

(citations omitted).  Upon de novo review, we conclude the facts do not satisfy the legal

test of exigency.  The judgment of the district court is **AFFIRMED**.